# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| RANDY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-6042 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| RANDY PFISTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Randy Brown is an inmate at Stateville Correctional Center. He suffers from glaucoma, a chronic disease that causes high pressure in his eyes and can lead to blindness. To treat his glaucoma, he is prescribed three kinds of medicinal eye drops. He must use each of them twice per day.

Brown alleges that, since 2010, prison officials have repeatedly seized his eye drops during "shakedowns" without returning them or providing him with an adequate replacement. As a result, he has experienced painful symptoms and has had to undergo surgery on both eyes. Now, Brown is suing two wardens, two correctional officers, the estate of the prison's former medical director (Dr. Saleh Obaisi), and the company that provides healthcare services at the prison (Wexford Health Sources) under section 1983 for providing constitutionally inadequate medical care.

Two of those defendants, the estate of Dr. Obaisi and Wexford Health Sources, have moved for summary judgment. They argue that Brown failed to exhaust his administrative remedies at the prison before filing suit. Brown filed five grievances about his glaucoma. Even so, Defendants argue that those grievances suffer from procedural or substantive defects.

For the reasons stated below, Defendants' motion is granted in part, and denied in part. Not all of the grievances passed muster, but Brown did exhaust his administrative remedies.

## Background

Plaintiff Randy Brown has been in the custody of the Illinois Department of Corrections since 2002. *See* Ex. to Defs.' Statement of Material Facts, at 1 (Dckt. No. 97-1). He has been incarcerated at Stateville Correctional Center ("Stateville") since at least 2010. *Id*.; *see also* Third Am. Cplt., at ¶ 13 (Dckt. No. 75). Brown suffers from glaucoma, a chronic disease that causes elevated pressure in his eyes and can lead to vision loss. *See* Defs.' Statement of Material Facts, at ¶ 5 (Dckt. No. 97); *see also Glaucoma*, The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/glaucoma/symptoms-causes/syc-20372839 (last visited April 12, 2021).

### I. The Allegations[1]

In his complaint, Brown alleges that, when he arrived at Stateville in 2010, he had a prescription for three different kinds of medicinal eye drops to treat his glaucoma: Latanaprost, Dorzolamide, and Tomolol. *See* Third Am. Cplt., at ¶¶ 12–13 (Dckt. No. 75). He needed to use each of them twice daily. *Id.* Those drops help prevent the disease from progressing, but only if he uses them on "a regular basis." *Id*. at ¶ 12.

Brown alleges that, from the time he first arrived at Stateville, prison staff began regularly confiscating his eye drops during "shakedowns" without returning them or providing an adequate replacement. *Id*. at ¶ 13. As a result, Brown was "forced to endure months at a time without his medically prescribed eyedrops." *Id*. at ¶ 15.

---

[1] At the summary judgment stage, the Court ordinarily looks to the undisputed material facts, not the allegations of the complaint. Summary judgment is the time for evidence, not allegations. However, in this case, the allegations in the complaint are *themselves* material facts. Defendants argue that Brown failed to grieve the issues that he raises in his complaint. So, it is important to know what Brown alleges in the complaint.

It's not clear from the complaint exactly how many times prison staff confiscated Brown's eye drops, or what kind of replacement they provided in each instance.

However, Brown seems to allege that, from 2010 to 2017, the prison confiscated his eye drops at least a handful of times. Sometimes staff offered him an inadequate replacement – a different medication in "pill form" that was not effective at treating his glaucoma and gave him "skin rashes and other side effects." *Id*. at ¶¶ 14–15. On other occasions, the prison offered him no replacement at all. *Id*. (explaining that he received the alternative medication only "[i]nitially," and describing side effects from that medication lasting from 2011–2015).

By the summer of 2017, as a result of the inconsistent use of his eye drops, Brown suffered a "build-up of pressure" so severe that he had to undergo surgery on both eyes. *Id*. at ¶ 16. After surgery, a doctor prescribed the same three eye drops and directed Brown to use them twice daily for the indefinite future. *Id*.

After Brown's surgery, the prison seized his eye drops two more times: once on November 14, 2017, and again on August 8, 2019. *Id*. at ¶¶ 18, 31. After the prison seized his eye drops in November 2017, the staff did not provide replacement pills, and did not provide replacement drops for more than "seven days." *Id*. at ¶ 27. After the prison seized his eye drops in August 2019, the staff did not provide replacement pills, but they did provide replacement drops the "next day." *Id*. at ¶ 31.

## II.     The Grievances

In broad strokes, a prisoner exhausts his administrative remedies by submitting a written "grievance" to the prison describing the issue, letting the prison make a decision, and then appealing that decision to a final body called the Administrative Review Board ("ARB"). *See* 20 Ill. Admin. Code § 504.840 *et seq*.

3

The parties agree that Brown filed five grievances related to the shakedowns and his medical care beginning in 2015. *See generally* Pl.'s Resp. to Statement of Undisputed Material Facts (Dckt. No. 100). Some of them were emergency grievances, and some of them were ordinary grievances. The complaint alleges the following details.

**Grievance #1: August 3, 2015 (Emergency Grievance)[2]**

Brown submitted an emergency grievance to the warden on August 3, 2015. *See* Statement of Undisputed Material Facts, at ¶ 10 (Dckt. No. 97); Exs. to Statement of Undisputed Material Facts, at 10 (Dckt. No. 97-1). In the section of the form titled "Nature of Grievance," Brown checked the box labeled "Medical Treatment." *See* Exs. to Statement of Undisputed Material Facts, at 10 (Dckt. No. 97-1). In the section titled "Summary of Grievance," Brown stated that he had "glaucoma," that he was prescribed "eye drops," and that he had been without his medication for "over a month and a half." *Id*. He stated that he had turned in "refill sticker's [sic] to Med-Tech" and that he went to "sick call on July 26, 2015," where someone "assured" him that he would receive his medications "in a couple of day's [sic]." *Id*. He also stated that "security" and other "officers" had been taking his medications for "five years" and that he often had trouble getting refills because Stateville had "no one in optometry on staff." *Id*. at 11. He also said he could "feel the pressure build-up" in his eyes, and that his vision was "very blurry." *Id*.

---

[2] In the Statement of Undisputed Material Facts, Defendants refer to the grievance dated August 3, 2015 as "Grievance 1," and refer to the grievance dated April 27, 2015 as "Grievance 2." *See* Statement of Undisputed Material Facts, at ¶¶ 10, 12 (Dckt. No. 97). That's potentially confusing because it is not in chronological order. The grievance dated April 27, 2015 came first, but is called "Grievance 2." And the grievance dated August 3, 2015 came second, but is called "Grievance 1." Still, for purposes of this Opinion, this Court sticks with the nomenclature used by the parties. Switching the names at this point might create more confusion.

4

The warden marked that grievance "received" on August 10, 2015. *Id*. at 10. Next to the question about the existence of an emergency ("Is this determined to be of an emergency nature?"), the warden checked a box reading: "No; an emergency is not substantiated. Offender should re-submit this grievance in a normal manner." *Id*.

On August 28, 2015, Brown sent a copy of his emergency grievance to the Administrative Review Board. *Id*. The ARB returned his grievance using a form entitled "Return of Grievance or Correspondence" on November 24, 2015, without addressing it on the merits. *Id*. at 9.

The form identified two reasons why the "attached grievance or correspondence is being returned." *Id*. Two checked boxes appeared under the heading "Additional information required." *Id*. One checked box stated: "Provide a copy of your written Offender's Grievance, DOC 0046, including the counselor's response, if applicable." *Id*. The other checked box stated: "Provide a copy of the Response to Offender's Grievance, DOC 0047, including the Grievance Officer's and Chief Administrative Officer's response, to appeal." *Id.*

**Grievance #2: April 27, 2015 (Emergency Grievance)**

On April 27, 2015, Brown submitted another emergency grievance directly to the warden. *See* Statement of Undisputed Material Facts, at ¶ 12 (Dckt. No. 97); Exs. to Statement of Undisputed Material Facts, at 14 (Dckt. No. 97-1). In the section of the grievance form titled "Nature of Grievance," Brown checked two boxes, one labeled "Personal Property" and the other labeled "Staff Conduct." *See* Exs. to Statement of Undisputed Material Facts, at 14 (Dckt. No. 97-1). In the section titled "Summary of Grievance," Brown stated that a group of officers that he called "Orange Crush" had conducted a "shake-down" that day. *Id*. He alleged that officers had seized his personal property, including "three (3) eyedrops for his glycoma [sic]." *Id*. He

5

also stated that he had called "health care" about getting the drops replaced, but was "afraid that I will have to wait several weeks without the use's [sic] of my eye medication, which when I don't use [sic] twice a day every day, the pressure builds up in my vision." *Id*. at 15.

The warden marked that grievance "received" on May 4, 2015. *Id.* at 14. But the warden concluded that the grievance was not an emergency. Next to the question about the existence of an emergency ("Is this determined to be of an emergency nature?"), the warden checked a box reading: "No; an emergency is not substantiated. Offender should re-submit this grievance in a normal manner." *Id*.

It's not exactly clear what Brown did next. Maybe he submitted his emergency grievance as an ordinary grievance to his counselor, or maybe his emergency grievance was simply forwarded to his counselor. In any case, Brown's counselor somehow received a copy, and on June 27, 2015, he issued a response. The counselor concluded that Brown's claim could not be substantiated. *Id*.

Brown appealed that decision to his grievance officer. *Id*. at 13. On November 10, 2015, the grievance officer issued a statement agreeing that the claim could not be substantiated. *Id.* On November 20, 2015, the warden issued a ruling concurring in the decision. *Id*. At that point, Brown appealed to the ARB. On August 9, 2016, the ARB issued a final ruling concluding that Brown's claim could not be substantiated. *Id*. at 12.

**Grievance #3: May 7, 2016**

On May 7, 2016, Brown filed a non-emergency grievance. *See* Statement of Undisputed Material Facts, at ¶ 14 (Dckt. No. 97); Exs. to Statement of Undisputed Material Facts, at 18 (Dckt. No. 97-1). In the section titled "Nature of Grievance," Brown checked the box labeled "Staff Conduct." *See* Exs. to Statement of Undisputed Material Facts, at 18 (Dckt. No. 97-1). In

the section titled "Summary of Grievance," Brown stated that on January 13, 2016, "Orange Crush" came into his cell, conducted a strip search, and confiscated some of his belongings including all three of his eye drop medications. *Id*.

Brown's counselor responded to his grievance on June 3, 2016, concluding that his claims were unsubstantiated. *Id*. Brown appealed that decision, and in September 2016, both Brown's grievance officer and the warden issued decisions concurring that his claims could not be substantiated. *Id*. at 17.

Brown appealed that decision to the ARB. Again, the ARB returned Brown's appeal without addressing it on the merits. On the return form dated February 22, 2017, the ARB checked a box under the heading "No further redress." *Id*. at 16. It stated: "Not submitted in the timeframe outlined in Department Rule 504; therefore this issue will not be addressed further." *Id*. In the section for additional information, the ARB noted that it "received grievance 60 days past 1/13/16 grievance issue." *Id*.

**Grievance #4:  January 24, 2017**

On January 24, 2017, Brown filed another non-emergency grievance. *See* Statement of Undisputed Material Facts, at ¶ 16 (Dckt. No. 97); Exs. to Statement of Undisputed Material Facts, at 22 (Dckt. No. 97-1). He did not check a box in the section titled "Nature of Grievance." In the section titled "Summary of Grievance," Brown stated that, on January 24, 2017, officers came to his cell and took some of his belongings. Among other things, they took two of his eye drop medications, "Latanoprost and Drozolamide," which Brown "must take twice a day for [the] rest of my life." *See* Exs. to Statement of Undisputed Material Facts, at 18 (Dckt. No. 97-1).

7

Brown's counselor thought there might be something to his grievance and forwarded it to Brown's grievance officer for review. *Id*. On February 24, 2017, his grievance officer issued a response, finding that his claim could not be substantiated. *Id*. at 21. That report also stated that "[a]ccording to Health Care Unit staff the offender went to UIC on 2/17/17 and was seen by Dr. Obaisi on 2/22/17 for his eye condition. Offender is advised to sign up for sick call in order to address any medical issues or concerns." *Id*.

Brown appealed that grievance to the ARB. This time, the ARB addressed Brown's grievance on the merits. *Id*. at 20. The ARB issued a report on June 1, 2017, stating that Stateville had addressed the issue appropriately. *Id*.

### Grievance #5: November 14, 2017 (Emergency Grievance)

On November 14, 2017, Brown submitted a final emergency grievance to the warden. *See* Statement of Undisputed Material Facts, at ¶ 18 (Dckt. No. 97); Exs. to Statement of Undisputed Material Facts, at 25 (Dckt. No. 97-1). In the section titled "Nature of Grievance," Brown checked the boxes labeled "Staff Conduct" and "Personal Property." *See* Exs. to Statement of Undisputed Material Facts, at 25 (Dckt. No. 97-1). In the section titled "Summary of Grievance," Brown stated that "on 11/14/2017 [at] 8:30 A.M. orange crush conducted a shake-down," and "confiscated two bottle's [sic] of eye drop's [sic]." *Id*. Brown also stated that "this has been an on going [sic] problem since 2010," that he recently had surgery on his eyes, and that the eye drops "help reduce the pressure in offender's eyes so that he want [sic] go blind in both eyes." *Id*.

The warden marked the grievance received on November 20, 2017. *Id.* Next to the question about the existence of an emergency ("Is this determined to be of an emergency

nature?"), the warden checked a box reading: "No; an emergency is not substantiated. Offender should re-submit this grievance in a normal manner." *Id*.

On December 8, 2017, Brown submitted a copy of his emergency grievance directly to the ARB. *Id*. The ARB returned Brown's grievance on December 12, 2017, without addressing it on the merits. *Id*. at 24. In the section of the return form stating reasons, the ARB checked two boxes under the heading "Additional information required," one asking for a copy of his counselor's response to his grievance, and one asking for the response to his grievance from the grievance officer and the chief administrative officer. The ARB also checked one box under the heading "Misdirected" which read: "Personal property and medical issues are to be reviewed at your current facility prior to review by the Administrative Review Board." *Id*.

## III. The Litigation

Brown filed this suit in September 2018. *See* Statement of Undisputed Material Facts, at ¶¶ 2–3 (Dckt. No. 97). He brought claims against a number of defendants, including the estate of Dr. Saleh Obaisi, who served as the prison's Medical Director until 2017, and Wexford Health Sources, a private company that provided medical services to the prison. *Id*. at ¶¶ 7–8.

The core of Brown's claims against the estate of Dr. Obaisi and Wexford is that, when his eye drops were confiscated, Dr. Obaisi and Wexford did not provide him with refills in a timely manner. *See* Third Am. Cplt., at ¶¶ 64–65 (Dckt. No. 8). Specifically, Brown alleges that Dr. Obaisi and Wexford knew that "disrupting, denying and delaying glaucoma treatment was an excessive risk to Plaintiff's health" and that they consciously disregarded that risk by failing to provide replacement eye drops in a prompt fashion. *Id*. at ¶ 65. He also claims that the delay in replacing his eye drops was due to Wexford's policy of "failing to adequately train its employees," failing to "appropriately staff its healthcare units," and "referring patients to offsite

9

medical services," which caused "extraordinary delays in patient inmates receiving necessary medical treatment in a timely fashion." *Id.* at ¶¶ 62, 64.

## Discussion

The estate of Dr. Obaisi and Wexford now move for summary judgment, and they make only one argument. They contend that Brown never exhausted his administrative remedies. Failure to exhaust is an affirmative defense, so Defendants bear the burden of proof. *See Jones v. Bock*, 549 U.S. 199, 216 (2007).

### I. Exhaustion

There is no general exhaustion requirement for cases brought under 42 U.S.C. § 1983, but "a special rule applies to actions brought by prisoners." *Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828, 831 (7th Cir. 2020); *see also Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Booth v. Churner*, 532 U.S. 731, 740–41 (2001).

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In other words, a prisoner can bring a claim in federal court only if he has exhausted all of the administrative remedies that were "actually available" at the prison. *Williams*, 957 F.3d at 831.

The PLRA does not dictate what administrative process a prison needs to provide, or what a prisoner needs to do to complete that process and thus exhaust his administrative remedies. *See Jones*, 549 U.S. at 218. Instead, state law creates the administrative process and defines what it takes to complete it. *Id*. Brown is a prisoner in Illinois, so the Illinois Administrative Code defines the administrative process that he needed to complete. *See* 20 Ill. Admin. Code § 504.840 *et seq*. In broad strokes, the Code requires a prisoner to submit a formal

written grievance complaining about a particular issue, get a decision on the merits, and then continue appealing that decision all the way up to a body called the Administrative Review Board. As explained below, different procedures apply to emergencies and non-emergencies.

The Seventh Circuit takes a "strict compliance approach to exhaustion." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). That is, to exhaust his administrative remedies, a prisoner must have complied with *every* procedural and substantive requirement outlined in the Code. *Id*. "If he or she fails to do so, the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Id.*

In this case, Defendants argue that Brown failed to exhaust his administrative remedies, despite filing grievances five times. Defendants contend that three of the five grievances did not follow the procedural rules. Defendants also argue that none of the five grievances were adequate as a matter of substance. The Court addresses procedural issues first, and then turns to substantive issues.

### A. Procedural Defects

First, Defendants argue that Brown did not follow the procedural rules laid out in the Code when he submitted Grievances #1, #3 and #5. *See* Defs.' Mem. of Law in Supp. of Summ. J., at 4–6, 8 (Dckt. No. 95).

The Illinois Administrative Code establishes two sets of procedural rules. *Williams*, 957 F.3d at 832. An inmate must comply with one set of rules for a normal grievance, and must comply with a different set of rules for a grievance that raises an emergency issue. An inmate indicates whether a grievance raises an emergency issue by checking a box on the grievance form. *See, e.g.*, Exs. to Statement of Undisputed Material Facts, at 18 (Dckt. No. 97-1).

To exhaust administrative remedies for "normal problems," an offender must complete a "three-stage process." *Williams*, 957 F.3d at 831; *see also* 20 Ill. Admin. Code § 504.800 *et seq.* First, the inmate must "attempt to resolve the problem through his or her counselor." *See Williams*, 957 F.3d at 831 (citing *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016)). "If that does not resolve the problem, the inmate must invoke step two, which involves the filing of a written grievance with a grievance officer . . . within 60 days after discovery of the problem." *Id*. (quoting *Pyles*, 829 F.3d at 864). "If the grievance officer denies the grievance and the chief administrative officer (normally the warden) affirms that decision, then the inmate must move to step three, which is an appeal to the IDOC's director, who relies on the review and recommendations of the ARB." *Id.* Once the inmate has heard back from the ARB on the merits, the inmate has exhausted his administrative remedies.

A truncated procedure applies to emergency grievances. The inmate submits his grievance straight to the warden. *Id*. at 832. The warden decides whether the grievance describes an "emergency," which the Code defines as "a substantial risk of imminent personal injury or other serious or irreparable harm to the offender." *Id.* (quoting 20 Ill. Admin. Code § 504.840).

If the warden decides that the grievance involves an emergency, "he or she shall expedite processing of the grievance and respond to the offender, indicating what action shall be or has been taken." *See* 20 Ill. Admin. Code § 504.840. Until April 1, 2017, "the Illinois Administrative Code did not expressly address what should happen if the warden concludes that the grievance does *not* present an emergency." *Williams*, 957 F.3d at 832. However, on April 1, 2017, the Code was amended, and now provides: "If the Chief Administrative Officer determines that the grievance should not be handled on an emergency basis, the offender shall be

notified in writing that he or she may resubmit the grievance as non-emergent, in accordance with the standard grievance process." 20 Ill. Admin. Code § 504.840.

### 1. Normal Grievance: Grievance #3

Brown filed Grievance #3 as a "normal" grievance. *See* Exs. to Statement of Undisputed Material Facts, at 18 (Dckt. No. 97-1). Defendants argue that Brown did not follow the procedure laid out in the Code for Grievance #3 because he filed it more than 60 days after the incident. *See* Defs.' Mem. of Law in Supp. of Summ. J., at 7 (Dckt. No. 96). Grievance #3 complains about a shakedown that took place on January 13, 2016. *See* Exs. to Statement of Undisputed Material Facts, at 18 (Dckt. No. 97-1). Brown filed the grievance on May 7, 2016, 115 days later. *Id*.

Brown does not dispute that he filed Grievance #3 outside the 60-day window and thus did not follow the procedures laid out in the Code. Instead, he points out that, in Grievance #3, he explicitly stated that he was following up on a different grievance – one filed on January 13, 2016 – to which he never received a response. *Id.* It's not clear why Brown thinks this fact helps him. The Code does not say that if a prisoner files a grievance within the 60-day window and does not receive a response, a second grievance filed at any later point is timely if it covers the same ground.

Brown seems to argue that justice demands that the Court make an exception for him. He states he "should not be punished" for "prudently re-issu[ing] a grievance through the appropriate process." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 10 (Dckt. No. 99). But there is no evidence in the record about the content of the January 13, 2016 grievance. And, more importantly, this Court lacks the power to rewrite statutory text and hand out *ad hoc* exceptions.

13

It is undisputed that Brown filed Grievance #3 more than 60 days after the incident in question. Therefore, Grievance #3 does not satisfy the exhaustion requirement.

## 2. Emergency Grievances: Grievances #1 and #5

Brown filed Grievances #1 and #5 as emergency grievances. In this case, the warden found that neither Grievance #1 nor #5 described an "emergency." *See* Exs. to Statement of Undisputed Material Facts, at 10, 25 (Dckt. No. 97-1).

Brown filed Grievance #5 after April 1, 2017. At that point, the procedure he needed to follow was clearly laid out in the Code. He needed to "resubmit his grievance[] under the normal procedure and complete the full three-stage process in order fully to exhaust available remedies." *Williams*, 957 F.3d at 832. The parties agree that Brown did not do that. Therefore, Grievance #5 cannot satisfy the exhaustion requirement.

The procedure Brown needed to follow to exhaust Grievance #1, which was filed before the statutory amendment, is a little less clear. The Seventh Circuit addressed this issue in *Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828 (7th Cir. 2020).

In *Williams*, the plaintiff submitted an emergency grievance in August 2016 – long before the Code was amended in April 2017. *Id*. The warden determined that the grievance was not an emergency, "and checked the box with the statement that the Offender 'should submit this grievance in the normal manner.'" *Id*. at 831. In response, Plaintiff lodged an appeal with the ARB. The ARB "returned the grievance to Williams without expressing a view on the merits." *Id*. Instead, "it checked boxes on a form indicating that Williams had not satisfied the requirements of the *standard* procedure, telling him that he was required to provide responses from his counselor, the Grievance Officer, and the Chief Administrative Officer." *Id*. (emphasis

14

in original). The ARB "did not tick the box that was available for simple requests for additional information." *Id*.

The Seventh Circuit found that Williams had exhausted his administrative remedies. It held that prisoners who filed emergency grievances before April 1, 2017 did *not* need to resubmit their grievances through normal channels to exhaust their remedies. *Id*. at 832. So, the fact that Williams did not resubmit his grievance before appealing to the ARB was not a barrier. However, the holding about what prisoners *did* need to do was relatively fact bound. The Court of Appeals found that Williams had exhausted his remedies, but acknowledged that the result *might* have been different if: (1) his assertion that his grievance was an "emergency" was "frivolous," or (2) the ARB had "simply asked for additional information related to the grievance" as opposed to directing him to file an ordinary grievance. *Id.* at 835. The caveat related to the ARB asking for more information seemed to be motivated by a concern that the ARB would be forced to adjudicate grievances without the proper factual record. *Id*. at 835 ("That [second caveat] largely answers Wexford's stated concern[] . . . that the warden or ARB would be unable to collect pertinent information.").

In a subsequent case presenting nearly identical facts, the Court of Appeals took the same approach. *See Jones v. Bayler*, 834 F. App'x. 283, 285 (7th Cir. 2021). It concluded that the prisoner had exhausted his remedies, but declined to lay down a broadly applicable rule for what a prisoner must do in every case. *Id*.

Fortunately, in this case, the absence of a general rule for pre-amendment grievances is not an issue because Brown took precisely the same steps with respect to Grievance #1 as the plaintiffs in *Williams* and *Bayler*. *See Williams*, 957 F.3d at 832–33; *Bayler*, 834 F. App'x. at 284–85. That is, he filed an emergency grievance, appealed to the ARB when it was marked

15

non-emergency, and then received a response from the ARB telling him to submit responses from his counselor, the grievance officer, and the chief administrative officer (and thus use the ordinary procedure). *See* Exs. to Defs.' Statement of Material Facts, at 9 (Dckt. No. 97-1).

In sum, Grievances #3 and #5 did not exhaust Brown's administrative remedies because he did not comply with the procedural rules set out in the Code. Grievance #1 complied with the procedural rules, so the Court now turns to the substance of that grievance and the remaining grievances.

### B. Substance

Next, Defendants argue that all three of Brown's remaining grievances (#1, #2, and #4) are substantively defective for two reasons. *See* Defs.' Mem. of Law in Supp. of Summ. J., at 4–7 (Dckt. No. 96). First, they argue that the grievances did not cover all the issues that Brown raises in his complaint. Second, they argue that to the extent the same issues are raised, Brown did not provide the level of detail required by the Administrative Code.

#### 1. Identity of the Issues

First, the estate of Dr. Obaisi and Wexford argue that Grievances #1, #2, and #4 did not address all the issues that Brown raised in his complaint filed in federal court. So, in their view, those grievances cannot satisfy the exhaustion requirement.

The PLRA's exhaustion requirement affords correctional officials a chance to address inmate complaints internally, before resorting to federal litigation. *See, e.g.*, *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006) (citing *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)). Therefore, an issue raised in the complaint is only considered "exhausted" if the grievances gave the prison a "fair opportunity" to address the issue before the lawsuit was filed. *See Maddox v. Love*, 655 F.3d 709, 713 (7th Cir. 2011); *see also Westefer v. Snyder*, 422 F.3d 570, 580 (7th Cir. 2005).

16

Here, the thrust of Brown's complaint is that, when his eye drops were seized, he did not receive an adequate replacement in a timely manner. He also alleges that the delay was due at least in part to Wexford's policy of not having an optometrist on staff. *See* Third. Am. Cplt., at ¶¶ 50–52, 64–66 (Dckt. No. 75). The Court concludes that all three of Brown's remaining grievances (#1, #2, and #4) gave the prison a "fair chance" to deal with that issue.

Grievance #1 addresses both the issue of delayed refills and Wexford's staffing policies. Brown marked the subject of the grievance "Medical Treatment." *See* Exs. to Statement of Undisputed Material Facts, at 10 (Dckt. No. 97-1). He stated that he turned in "refill sticker's [sic] to Med-Tech," went to "sick call on July 26, 2015," and went without medication for "over a month and a half." *Id*. at 10–11. Brown also raised Wexford's staffing policy. He stated that he often had trouble getting refills of that medication because the prison had "no one in optometry on staff." *Id*. at 11.

That grievance is on point. Any reasonable official reading that grievance would understand that Brown wanted refills of his medication in a timely manner, and that he believed that the delay was due in part to the prison not having an optometrist on staff.

Grievance #2 squarely addresses the issue of delayed refills. Brown stated that the prison seized his eye drops. *Id.* at 14. In response, Brown reached out to a "med-tech" who took down his information, and Brown "called health care." *Id.* at 14–15. After speaking to health care, Brown was "afraid that I will have to wait several weeks without the use's [sic] of my eye medication, which when I don't use [sic] twice a day every day, the pressure builds up in my vision." *Id.* at 15.

Grievance #4 is less direct. Brown stated that on January 24, 2017, officers came to his cell again and took two of his eyedrop medications, "Latanoprost and Drozolamide," which he

17

claimed he "must take twice a day for [the] rest of my life." *Id*. at 22. The focus of the grievance was on what prison security staff did (*i.e.,* taking his medication), not what the medical staff did (*i.e.,* failing to replace it).

That said, the prison officials who read Brown's complaint clearly understood his grievance to be, at least in part, about what the medical staff had done. After Brown filed his grievance, his grievance officer reached out to the prison medical staff. In his response, Brown's grievance officer wrote that "[a]ccording to Health Care Unit staff the offender went to UIC on 2/17/17 and was seen by Dr. Obaisi on 2/22/17 for his eye condition. Offender is advised to sign up for sick call in order to address any medical issues or concerns." *Id*. at 21. Stateville staff clearly read Brown's grievance to complain about his eye condition. The grievance served its function of putting the prison on notice, and giving them a chance to address the problem.

In sum, Grievances #1, #2, and #4 put the prison on notice that Brown was not receiving refills of his medication in a timely manner, and that the lack of an optometrist on staff contributed to the delay.

### 2. Factual Detail

Next, Defendants argue that to the extent the grievances do raise the issues in the complaint, Brown did not provide the level of detail required by the Administrative Code. Section 504.810 of the Code requires "factual details" about what happened:

> The grievance shall contain factual details regarding each aspect of the offender's complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names

of individuals are not known, but the offender must include as much descriptive
information about the individual as possible.

See 20 Ill. Admin. Code § 504.810.

In particular, Defendants focus on the requirement embodied in the first sentence of that section, that "[t]he grievance shall contain . . . the name of each person who is the subject of or who is otherwise involved in the complaint." *Id.* They point out that two of the three grievances do not name Dr. Obaisi, and none names Wexford.

This argument falls flat. As the Seventh Circuit has pointed out, "the identification requirement in the first sentence is softened by the second sentence, which clarifies that prisoners need identify names only to the extent practicable." *Glick v. Walker*, 385 F. App'x. 579, 582 (7th Cir. 2010). The Code doesn't require the prisoner to do more than "articulat[e] what facts the prison could reasonably expect from a prisoner in his position." *Id*.

For example, in *Glick*, the plaintiff complained that he was given too high of a security classification, which prevented him from participating in group therapy, and that he was assigned to a smoking cell. *Id.* at 581–82. Defendants argued that Plaintiff had not exhausted his remedies because his grievance did not name any of the individual defendants. *Id.* at 581. He merely complained about the policies themselves. The Seventh Circuit rejected that argument, explaining that "[g]rievances are intended to give prison administrators an opportunity to address a shortcoming, not to put individual defendants on notice of a lawsuit," and that "it would be unreasonable to expect that, for every set of facts, an inmate will be able to peel back layers of bureaucracy and match a disputed decision with the prison employee responsible for that decision." *Id*. at 582 (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)).

Here, Brown provided all of the facts that the prison could have reasonably expected. In Grievances #1, #2, and #4, he revealed when the prison took his medication, what steps he took

19

to get a refill, and why it mattered to his health. *See* Exs. to Defs.' Statement of Material Facts, at 10, 14, 22 (Dckt. No. 97-1). Like the plaintiff in *Glick*, it was not necessary for him to figure out the name of the prison's medical director or the company responsible for providing healthcare services to have exhausted his remedies. *See Glick*, 385 F. App'x. at 582.

The grievances didn't present much of a whodunit. Brown complained about the lack of access to medical care. So, the grievances naturally called into question the provider of the medical care, including the person running the department. The situation might be different if the grievances did not give the reader enough information to figure out who was involved. But no one could be stumped by these particular grievances. The prison knew who ran the medical care.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. Brown did not exhaust his administrative remedies for Grievances #3 (dated May 7, 2016) and #5 (dated November 14, 2017), so the motion for summary judgment is granted to the extent that Plaintiff's claim relies on those grievances. Brown did exhaust his administrative remedies for Grievances #1 (dated August 3, 2015), #2 (dated April 27, 2015), and #4 (dated January 24, 2017), so the motion for summary judgment is denied to the extent that Plaintiff's claim relies on those grievances.

Date: April 30, 2021

Steven C. Seeger
United States District Judge